**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be**
**_physically received_ in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 19, 2015**

# In the Court of Appeals of Georgia

A14A2080. BOATNER et al. v. SHOW MEDIA, LLC.

BARNES, Presiding Judge.

Kenneth and Hattie Boatner were on a motorcycle that was struck by one of a fleet of cars being driven around Atlanta as part of an advertising campaign. They sued the driver for negligence, and Show Media, LLC, and its related corporate entities (collectively, "Show Media") under the doctrines of respondeat superior and negligent entrustment.[1] Following discovery, Show Media moved for summary judgment, contending that, while the driver "negligently made a U turn in opposing traffic directly in front of the [Boatners,] striking the Boatners' Motorcycle and knocking them to the road surface," the evidence established without issue that it was not liable under either theory of recovery because the driver was an independent

---

[1] The related entities are Show Media of New York, LLC, and Show Media Promotions, LLC, d/b/a/ Show Media Live.

contractor. The trial court granted summary judgment to Show Media under both theories.

The Boatners argue on appeal that the trial court erred in granting summary judgment to Show Media on their respondeat superior claim because the record reveals genuine issues of disputed facts about whether the driver who hit them was Show Media's temporary employee or an independent contractor. As they do not appeal the trial court's grant of summary judgment to Show Media on their negligent entrustment claim, that portion of the trial court's judgment is affirmed. For the reasons that follow, however, we reverse the grant of summary judgment to Show Media on the Boatners' claim of vicarious liability.

> Summary judgment is appropriate when the court, viewing all the facts and evidence and reasonable inferences from those facts in a light most favorable to the non-movant, concludes that the evidence does not create a triable issue as to each essential element of the case. On appeal of a grant of summary judgment, we must review the evidence de novo to determine whether the trial court erred in concluding that no genuine issue of material fact[] remain[s] and that the party was entitled to judgment as a matter of law.

(Citation and punctuation omitted.) *Broadnax v. Daniel Custom Construction*, 315 Ga. App. 291, 292 (726 SE2d 770) (2012).

2

So viewed, the evidence showed that Show Media Promotions contracted with companies to produce promotional events which "would include providing brand ambassadors, wrapped vehicles, buses, putting brand ambassadors out there in costumes." HTC Corporation hired an advertising company, Deutsch, LA, to conduct an "advertising event" simultaneously in Seattle and Atlanta to promote the sale of its cell phones. Deutsch hired Show Media Promotions to provide "8 Fully wrapped [S]mart [C]ars including drivers - 1 wifi mobile hotspot - 1 mobile billboard 6'x12' - 105 working hours per vehicle" to start June 21, 2010, and end July 10, 2010, for a total fee of $312,978. The contract between Deutsche and Show Media provided no other specifics about the advertising campaign.

Show Media's controller testified as the company's designated Rule 30 (b) (6) representative that he could not tell from the contract what the cars were supposed to do. The controller explained that after a company salesperson procured the contract, he would usually sit down with a Show Media graphics department employee to discuss the job and assign it to a specific person to handle the creative work, designing the graphics and working with vendors to produce the advertising material.

For this job, Show Media hired Limo Lounge, owned by Pedro Torre, to secure the Smart Cars and drivers for both cities at a rate of $10,000 per week per city. Torre

3

rented the cars from Avis in South Miami Beach, Florida, on June 17, 2010 and returned them there a month later.

Matthew Salmon worked in Show Media's graphic department and testified that he came to Atlanta with another Show Media employee to oversee the Deutsche/HTC campaign and "make sure it was on track." When he arrived, the eight Smart Cars were in place and wrapped with the advertising vinyl, and Torre had procured the drivers. Salmon rented a car at the airport and bought a trailer hitch for his rental car to tow the mobile billboard, which was simply a static vinyl sign with the company name and product. He used his personal credit card to pay for his rental car and Show Media paid him back. When Salmon arrived in Atlanta, he held an initial meeting with the drivers to explain the job to them, which was to follow each other through pre-routed highly-trafficked areas of the city.

Every night, Salmon called someone at Show Media to obtain instructions about where Show Media wanted the cars to drive the next day. Each day, Show Media assigned a specific route for the cars to drive and wanted the cars to arrive at particular locations at particular times of the day. Show Media directed what time the group would begin driving and when they would stop, which averaged about eight

4

or nine hours a day. If Salmon, his co-worker, or Torre wanted to alter the route, they had to run it by Show Media, who made the ultimate determination about the route.

Every morning, either Salmon met with Torre and the other drivers wherever they were staying and told them about the day's "game plan" or Torre would get information from Show Media about the day's route and tell the drivers. While the crew began driving the wrapped cars through the city as directed by Show Media, Salmon and his co-worker drove his rental car, towing a trailer with the HTC billboard on it, at the back of the line "to make sure that everybody was staying in line, to make sure that everybody was in the same area." They did not always follow the crew for the entire day, but sometimes split off for lunch or to do other business and rejoined them later. Sometimes the cars would split up and go to different locations, as directed by Show Media. If Salmon rejoined the drivers and found them sitting around in a parking lot when they were supposed to be driving, Salmon would direct them to get back out onto the road. The drivers were not allowed to drive the wrapped cars for personal use but were supposed to park them at the hotel when the job ended for the day.

In granting summary judgment to Show Media, the trial court found that the driver of the wrapped car that hit the Boatners was hired, paid, and generally

5

supervised by Torre, and that "[t]he only degree of supervision was [Show Media's] initial meeting with Mr. Torre and all the drivers each day to establish where the designated route was located." This evidence, the court found, pierced the Boatners' complaint of vicarious liability under the doctrine of respondeat superior and shifted the burden to them to establish an issue about whether the driver was a Show Media employee rather than an independent contractor. The court concluded that the record contained no such evidence and that therefore Show Media could not be held vicariously liable for Smeltzer's actions. The court also granted summary judgment to Show Media on the Boatners' negligent entrustment claim because the record contained no evidence that Show Media had actual knowledge that the driver was incompetent or habitually reckless. Finally, the court held, Show Media had no duty to investigate the competency of any driver to whom it entrusted a vehicle.

The Boatners argue on appeal that the trial court erred in granting summary judgment to Show Media on their claim of vicarious liability under the doctrine of respondeat superior because the record establishes the existence of genuine issues of material fact about whether the driver was a temporary employee of the company. Show Media responds that the record establishes as a matter of law that the driver was an independent contractor for whose actions the company was not vicariously liable.

6

"An employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and … is not subject to the immediate direction and control of the employer." OCGA § 51-2-4. In contrast, "[a]n employer is liable for the negligence of a contractor … [i]f the employer retains the right to direct or control the time and manner of executing the work or interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference[.]" OCGA § 51-2-5 (5).

> The test for determining whether an employer is exercising a degree of control over an independent contractor's work such that the law will deem the independent contractor to be a servant of that employer — thus making the employer vicariously liable for any wrongful acts committed by the contractor — is whether the contract gives, or the employer assumes, the right to control the time, manner, and method of the performance of the work, as distinguished from the right to merely require certain definite results in conformity with the contract. Put another way, the test is essentially whether the contractor has a bona fide existence apart from the employer or functions instead as the employer's alter ego.

(Punctuation and footnotes omitted.) *Ga. Messenger Svc., Inc. v. Bradley*, 311 Ga. App. 148, 150 (1) (715 SE2d 699) (2011).

7

Here, although there is evidence to support the conclusion that the driver was an independent contractor, in that Show Media did not pay her directly, choose her break times, or supervise her activities when she was not driving, there is also evidence to support the conclusion that Show Media maintained sufficient control over the driver that she can be considered an employee, such as instructing her on the time, method, and manner of her daily drive. "Under these circumstances, we cannot say that the evidence is undisputed." *Davis v. Beasley Lumber Co.*, 241 Ga. App. 706, 708 (1) (527 SE2d 221) (1999) (evidence that timber company directed truck driver's "timing and destination of hauls" sufficient to find that driver was employee). Accordingly, the trial court erred in granting summary judgment to Show Media on the Boatners' claim that Show Media was liable for the negligence of its driver.

*Judgment affirmed in part, reversed in part. Boggs and Branch, JJ., concur.*